# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs October 19, 2010

## STATE OF TENNESSEE v. LAWRENCE J. BROZIK

**Appeal from the Criminal Court for Fentress County**
**No. 8929    Shayne Sexton, Judge**

---

**No. M2009-01142-CCA-R3-CD - Filed January 18, 2011**

---

The Defendant, Lawrence J. Brozik, was charged with ten counts of especially aggravated sexual exploitation of a minor, a Class B felony. See Tenn. Code Ann. § 39-17-1005(c) (2003). Following a jury trial, the Defendant was convicted of ten counts of facilitation of especially aggravated sexual exploitation of a minor, a Class C felony. See Tenn. Code Ann. § 39-11-403(b) (2003). The trial court sentenced the Defendant as a Range I, standard offender to five years for each count and ordered that five of his sentences be served consecutively, for a total effective sentence of twenty-five years. In this direct appeal, he contends that: (1) the State presented insufficient evidence to convict him; (2) the State failed to disclose promises made to, or agreements with, the minor victim's husband; (3) the trial court erred when it found that he was the leader in the commission of an offense involving two or more criminal actors; (4) the disparity between the Defendant's sentence and the minor victim's husband's sentence violated the Tennessee Criminal Sentencing Reform Act of 1989; (5) the trial court erred by imposing consecutive sentences; and (6) the trial court erred when it found that evidence presented at the motion for new trial hearing was not sufficient to support a new trial. After our review, we affirm the Defendant's convictions but modify his sentences to be served concurrently.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court**
**Affirmed in Part; Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and D. KELLY THOMAS, JR., JJ., joined.

Tina L. Sloan, Assistant District Public Defender (on appeal); Paul Crouch, Office of the Public Defender (at trial), LaFollette, Tennessee, for the appellant, Lawrence J. Brozik.

Robert E. Cooper, Attorney General and Reporter; Mark A. Fulks, Assistant Attorney General; William Paul Phillips, District Attorney General; and John G. Galloway, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

In May 2005, a Fentress County grand jury indicted the Defendant for ten counts of especially aggravated sexual exploitation of a minor.[1] His trial was held on May 3 and 5, 2006.

Roberta Mitchell testified that, in April 2005, she worked with the Department of Children's Services as a case worker. She recalled that she investigated allegations that nude photographs of B.C., a minor, had been placed on the internet. Ms. Mitchell stated that she received copies of the photographs from her supervisor, as well as the names of people thought to be involved in the production of the photographs. She testified that the Defendant's name was among those given to her. Ms. Mitchell said that the Tennessee Bureau of Investigation (TBI) ultimately took over the investigation, but that she did sit-in on part of the TBI's interviews with B.C. and Cosby Conatser, Jr.,[2] the adult male depicted in the photos.

B.C., seventeen years old at the time of the trial, testified that she was married to Mr. Conatser, whom she had dated since she was fourteen years old, and that they had two children. She stated that Mr. Conatser introduced her to the Defendant in 2003, when she was fourteen years old and still in the eighth grade. B.C. said that she first went to the Defendant's house in the summer of 2003. She recalled that, during a visit to his house that summer, she told the Defendant that she was fourteen years old and was about to start the ninth grade. However, she acknowledged that Mr. Conatser had previously told the Defendant that she was older.

B.C. testified that she and Mr. Conatser used the Defendant's Polaroid camera to take pictures of each other naked at the Defendant's house in 2003. She stated that, although the Defendant was outside when the pictures were taken, he knew why they were using his camera. B.C. recalled that, about four or five months after she first went over to his house,

---

[1] The relevant ten offenses at issue in this appeal are counts two through eleven of the indictment; count one was severed.

[2] In a separate indictment, Mr. Conatser was charged in conjunction with the photos at issue.

the Defendant began taking pictures of her and Mr. Conatser's sexual activities. Among the photos she identified as being in the first set of pictures the Defendant took with his digital camera were Exhibits 14, 15, 16, and 17, which all showed B.C. performing fellatio on Mr. Conatser.[3] B.C. testified that it was the Defendant's idea to take these four photos. She elaborated, "I said I didn't want to, and he said that it would be an experience and so, I went ahead and done it."

B.C. said that the Defendant also took the photographs identified in Exhibits 18, 21, and 22, and that it was his idea to take the photos. She described that Exhibit 18 showed "[Mr. Conatser's] private parts on my private parts," Exhibit 21 depicted "[Mr. Conatser's] tongue on my private parts and his finger in my private parts," and Exhibit 22 was "[Mr. Conatser's] tongue on my private part." She testified that she felt "very uncomfortable" about the Defendant taking pictures of Mr. Conatser performing cunnilingus on her, and explained, "I'd tell him I didn't want to and he'd just keep on and asking and asking, so I just finally gave in and done it." She also stated, "I told him I didn't want him to take pictures, and he told me if I didn't look at him, I wouldn't know he was there." B.C. testified that after the Defendant took the pictures, she put them on his computer, printed one copy of each photo, took the pictures home with her, and put them in a locked box at her mother's house. She also testified that she erased the pictures from the Defendant's computer after she printed them out.

B.C. testified that the Defendant took the photo in Exhibit 27, which showed her performing fellatio on Mr. Conatser. She said that she downloaded the digital picture to the Defendant's computer but did not print it out.

She testified that the Defendant also took the photo in Exhibit 28, which depicted Mr. Conatser with his mouth on her buttocks. B.C. explained that she and Mr. Conatser were

---

[3] The State elected the following pictures to correspond with each of the ten counts of aggravated sexual exploitation of a minor listed in the indictment:

| Count | Exhibit number | Description |
|---|---|---|
| 2 | 14 | B.C. performing fellatio |
| 3 | 15 | B.C. performing fellatio |
| 4 | 16 | B.C. performing fellatio |
| 5 | 17 | B.C. performing fellatio |
| 6 | 22 | Cunnilingus performed on B.C. |
| 7 | 21 | Cunnilingus performed on B.C. |
| 8 | 18 | Sexual intercourse |
| 9 | 27 | B.C. performing fellatio |
| 10 | 28 | Mr. Conatser licking B.C.'s anus |
| 11 | 29 | Mr. Conatser licking B.C.'s nipple. |

"fooling around" while the Defendant was outside and, when he came back in and saw them, he wanted to take pictures. She said, "I said no, and he said—just said, 'Just go ahead and let me.'" She said that she did not believe she downloaded Exhibit 28 to the computer, and explained that sometimes she downloaded the pictures and sometimes the Defendant did. B.C. testified that when the Defendant put the photos on his computer, "[h]e would tell us and then he would pull them up and show us some."

B.C. testified that Exhibit 29 was a photo of Mr. Conatser with his "tongue on my breast" and that the Defendant took the picture. She also testified that the photo was the Defendant's idea, explaining, "He told [Mr. Conatser] to put his tongue there on my breast before I put my bra back on."

She stated that, for some of the pictures, the Defendant hung a blue tarp over a string across the wall "[s]o nobody could tell where the pictures had been [taken]."

During cross-examination, B.C. said that she spoke to a TBI agent about the photos in April 2005 and that she initially thought she was in trouble. She said that a Department of Children's Services worker was there and that she was scared because she did not want anything to happen to her five-month-old baby. B.C. also acknowledged that the TBI agent told her that he was also going to talk to Mr. Conatser.

B.C. stated that, at one time, the Defendant said that he was going to leave his property to Mr. Conatser. However, she said that he had later changed his mind and was going to bequeath it to someone else. She also testified that a few weeks before she spoke to the TBI agent, Mr. Conatser and the Defendant got into an argument over money and did not talk to each other after that. She recalled that Mr. Conatser broke his hand when he punched a crate during the argument.

B.C. testified that the Defendant's digital camera had a tripod and a timer. She acknowledged that she and Mr. Conatser had used the camera's timer-function before.

TBI Special Agent Steve Vinsant testified that, after he interviewed B.C. and Mr. Conatser, he obtained a warrant to search the Defendant's house. From the Defendant's house, he collected three laptop computers, a digital camera, two printers, a Polaroid camera, 90 CD-ROMs, about a hundred floppy disks, sheets, bedding, and a blue tarp. Special Agent Vinsant testified that the computer evidence recovery unit examined the computers that were confiscated. He also stated that, in conjunction with these photographs, Mr. Conatser had been charged with a crime.

Tom Davis, a computer evidence specialist employed by TBI, was deemed an expert in computer evidence recovery by the trial court. He testified that he examined the evidence collected at the Defendant's house. Mr. Davis stated that he recovered the photographs shown in Exhibits 27 and 28 from one of the Defendant's laptops and that he recovered the photograph in Exhibits 29, 30, and 31[4] from a memory stick for a digital camera.

Mr. Davis testified that, even if a person believes they have deleted a file from their computer or memory stick, someone trained in computer forensics may be able to recover the file. However, he said that a person with average computer skills would probably not be able to recover the file. He also testified that he had no way of telling who downloaded the pictures to the Defendant's computer. Mr. Davis said that the files he recovered from the Defendant's computer were saved in the directory under the Defendant's name.

The Defendant presented the testimony of Michael Campbell, who testified that he lived next door to the Defendant and that they had been friends for four years. Mr. Campbell recalled that he went to the Defendant's house every day and that he saw B.C. and Mr. Conatser there every other day. He estimated that he was at the Defendant's house ninety percent of the time that B.C. and Mr. Conatser were there. He testified that B.C. "always seemed like she was happy to be there," and he described that she would be using the Defendant's computer "all the time." Mr. Campbell testified that he never saw any of the photos at issue at the Defendant's house, nor did he see B.C. and Mr. Conatser engaged in sexual activity at the Defendant's house.

The Defendant testified that he met Mr. Conatser at the mill where he bought wood for his furnace. He said that Mr. Conatser later introduced him to B.C. when he brought her over to the Defendant's house and that the couple subsequently became frequent guests at his house. The Defendant stated that he did not find out B.C.'s real age until she said, "Now we can get married. I'm 16." He said that, when he first met B.C., both Mr. Conatser and B.C. told him that she was eighteen years old.

The Defendant recalled that B.C. "liked to play on the computer a lot" and that Mr. Conatser and him would talk "pieces of philosophy." The Defendant also testified that he planned to leave his property to Mr. Conatser but that he later decided not to because he did not approve of Mr. Conatser's drug use. He stated that, when he informed Mr. Conatser of his decision, Mr. Conatser "got disturbed . . . and then that led into some more kinds of conflict."

---

[4] Exhibits 30 and 31 were photos that B.C. testified that she and Mr. Conatser took themselves.

The Defendant also testified that he had lent Mr. Conatser money on multiple occasions, the last time lending him five hundred dollars so that he could buy a car. The Defendant said that he had loaned the couple the money because he was tired of being their "taxicab." He said that they would call him "incessantly" and ask him to drive them places.

The Defendant said that Mr. Conatser failed to pay him two hundred dollars by the agreed upon date and that they argued over the issue several days later. The Defendant recalled that, during the argument, Mr. Conatser broke his hand when he punched a wall. The Defendant also testified that, after this argument, Mr. Conatser said, "F you. I'm gonna tell them you shot the dirty pictures." The Defendant stated that he had not heard of any dirty pictures before that time. He also said that three weeks after Mr. Conatser's threat, Special Agent Vinsant came to his house. The Defendant stated that he had not spoken to Mr. Conatser since the day they argued and Mr. Conatser broke his hand.

The Defendant testified that he had not seen B.C. and Mr. Conatser having sex in his house. He also said that he had not taken or seen—on his computer, camera, or otherwise—any sexually explicit pictures of Mr. Conatser and B.C. He did admit that he had taken "maybe a thousand" photos of B.C.'s feet, and elaborated, "I like feet. I don't deny it."

The Defendant acknowledged that it appeared from the background in the photos that Exhibits 27, 28, and 29 were taken in his home. However, he explained that there were times when B.C. and Mr. Conatser would be alone at his house. He explained, "They had access to my house. . . . I said, you know, just treat this as your own. I left the door unlocked constantly for them." He also said that sometimes when he came home, B.C. and Mr. Conatser were already there.

On May 5, 2006, a jury convicted the Defendant of ten counts of the lesser-included offense of facilitation to commit especially aggravated sexual exploitation of a minor. The trial court held the Defendant's sentencing hearing on November 22, 2006, and sentenced the Defendant to five years for each count. The trial court ordered that five of the Defendant's sentences run consecutively, for a total effective sentence of twenty-five years. The Defendant filed a timely Motion for New Trial on November 22, 2006, and on December 2, 2008, he filed an Amended Motion for New Trial and a Motion to Reconsider Sentence. After a hearing on January 26, 2009, the trial court filed an order denying the Defendant's motions. The Defendant now appeals.

**Analysis**

In this appeal, the Defendant presents the following issues for review: (1) the State presented insufficient evidence to convict him; (2) the State failed to disclose promises made to, or agreements with, Mr. Conatser; (3) the trial court erred when it found that he was a

leader in the commission of an offense involving two or more criminal actors; (4) the disparity between the Defendant's sentence and Mr. Conatser's sentence violated the Tennessee Criminal Sentencing Reform Act of 1989; (5) the trial court erred by imposing consecutive sentences; and (6) the trial court erred when it found that evidence presented at the motion for new trial hearing was not sufficient to support a new trial.

**I. Sufficiency**

The Defendant contends that the State presented insufficient evidence to convict him of facilitation to commit especially aggravated sexual exploitation of a minor. He argues that B.C.'s "testimony was so inconsistent and improbable as to create a reasonable doubt."

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

At the time of the offense, the pertinent statute regarding the offense of especially aggravated sexual exploitation of a minor provided, "It is unlawful for a person to knowingly promote, employ, use, assist, transport or permit a minor to participate in the performance or in the production of material which includes the minor engaging in: (1) Sexual activity;

or (2) Simulated sexual activity that is patently offensive." Tenn. Code Ann. § 39-17-1005(a) (2003). Because the Defendant was convicted of facilitation of especially aggravated sexual exploitation of a minor, we note that "[a] person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a) (2003).

After reviewing the record, we conclude that the evidence presented by the State was sufficient to convict the Defendant of ten counts of facilitation to commit especially aggravated sexual exploitation of a minor. B.C. testified that, when she started going over to the Defendant's house in the summer of 2003, she told him that she was fourteen years old and that she was about to begin the ninth grade. She testified that, four or five months after she started visiting his house, the Defendant began using his digital camera to take photographs of B.C. and Mr. Conatser engaged in sexual activity. B.C. testified that the photos in Exhibits 14, 15, 16, and 17—the images corresponding with counts two through five—were taken by the Defendant with his digital camera and that the photos were his idea. She testified that she did not want to take the photos but that the Defendant told her "that it would be an experience," and she agreed to let him take the pictures. B.C. testified that the Defendant took the photos in Exhibits 18, 21, and 22—the basis for counts six through eight. She also said that she downloaded the pictures to the Defendant's computer, printed them out, and then erased them. Finally, B.C. testified that the Defendant took the photographs in Exhibits 27, 28, and 29, which were the corresponding images for counts nine through eleven. Moreover, Mr. Davis testified he recovered Exhibits 27 and 28 from one of the laptop computers seized from the Defendant's home. He also recalled that he recovered Exhibit 29 from a memory stick that was found in the Defendant's home.

In his brief, the Defendant contends that B.C.'s testimony was inconsistent because she testified at trial that the Defendant took pictures of her twenty different times, however, she originally told Special Agent Vinsant that the Defendant took pictures about ten times. He also argues that her testimony was influenced by the facts that she was married to Mr. Conatser, who had pending criminal charges related to this matter, and had young children whom she worried would be taken away from her. However, the jury was made aware of each of these inconsistencies and potential influences, and it chose to convict the Defendant of ten counts of a lesser-included offense. The credibility of witnesses is determined by the trier of fact, and this Court will not re-evaluate the evidence.

Thus, after reviewing the record, we conclude that the State presented sufficient evidence for any rational trier of fact to determine beyond a reasonable doubt that the

Defendant committed ten counts of facilitation to commit especially aggravated sexual exploitation of a minor.

## II. **Brady**[5] **Material**

The record indicates that, in May 2005, Mr. Conatser was charged with three counts of statutory rape, a Class E felony,[6] and one count of especially aggravated sexual exploitation of a minor, a Class B felony. See Tenn. Code Ann. § 39-13-506(c), -17-1005(c) (2003). However, on March 12, 2007, pursuant to the terms of a plea agreement with the State, Mr. Conatser pleaded guilty to one count of statutory rape and was sentenced to two years to be served on probation. The other three counts of the indictment were dismissed in accordance with the plea agreement. The Defendant asserts that "the trial court erred in not finding that the State failed to disclose Brady materials, specifically, the existence and substance of promises and agreements (between the State or its agents and [Mr.] Conatser and/or his agent(s)) given for the purpose of obtaining [B.C.]'s testimony, cooperation or disclosure of information."

Mr. Conatser testified during the Defendant's hearing for his motion for new trial. When asked about the circumstances surrounding a statement he gave to Special Agent Vinsant at the beginning of the investigation into the photographs, Mr. Conatser recalled, "He said if I didn't show up in [c]ourt, I could be facing up to eight years."

Mr. Conatser also testified that, after his statutory rape conviction, he was originally placed on supervised probation, but after he paid his fines, his probation became unsupervised. When asked if that was what his probation officer recommended, he replied, "No. That's what they recommended here in [c]ourt—after I paid my fines, I could be off supervised probation." Mr. Conatser acknowledged that he violated his probation after he was convicted of statutory rape, but that never appeared before the court and that he "just talked to Mitch about it and everything—John Galloway."[7] He also testified that he worked as a confidential informant for the State in February 2008.

B.C. also testified during the Defendant's motion for new trial hearing. She admitted that, when she spoke with Agent Vinsant in April 2005, she was concerned about her baby being taken away from her and about the possibility that Mr. Conatser would go to jail.

---

[5] See Brady v. Maryland, 373 U.S. 83 (1963).

[6] Mr. Conatser is eight years older than B.C.

[7] The record does not reflect who "Mitch" is; however, the record indicates that John Galloway is an Assistant District Attorney.

However, she testified that no one told her that if she cooperated, Mr. Conatser would not go to jail. She said she cooperated because she was worried her child would be taken away.

In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court established the prosecution's duty to furnish the accused with exculpatory evidence upon request by the defense. Id. at 87. Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. The duty to disclose exculpatory evidence extends to all "favorable information" irrespective of whether the evidence is admissible at trial. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). "Favorable information" includes evidence that could be used to impeach the State's witnesses. Id. at 55-56 (citations omitted). Further, our supreme court has instructed that the State must disclose "evidence of any agreement or promise of leniency given to the witness in exchange for favorable testimony against an accused." State v. Robinson, 146 S.W.3d 469, 512 (Tenn. 2004).

In order to establish a due process violation under Brady, a defendant must demonstrate the following:

> (1) The defendant must have requested the information (unless the evidence
> is obviously exculpatory, in which case the State is bound to release the
> information whether requested or not);
> (2) The State must have suppressed the information;
> (3) The information must have been favorable to the accused; and
> (4) The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). In order to establish that exculpatory evidence is "material," a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435 (1995); see also Edgin, 902 S.W.2d at 390. There must be a "'reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Edgin, 902 S.W.2d at 390 (quoting Kyles, 514 U.S. at 435).

Tennessee courts have examined situations in which a State's witness pleaded guilty to an offense after testifying against a defendant. In State v. Williams, a State's witness' case was continued until after the defendant's trial. 690 S.W.2d 517, 525 (Tenn. 1985). The witness pleaded guilty and received the minimum sentence for the offense. Id. The court noted that "the District Attorney General positively asserted that no leniency had been promised to [the witness] and the record is devoid of any evidence that plea negotiations had

in fact taken place or that the State had offered anything in exchange for a guilty plea from [the witness]." Id. Finding that the circumstances only amounted to a "suspicion," our supreme court held that there was no Brady violation. Id.

In State v. Robinson, a State's witness testified that, although the State had not made any promises to him in exchange for his testimony, he hoped that, because he was testifying, the State would not pursue the death penalty against him. 146 S.W.3d 469, 512-13 (Tenn. 2004). Moreover, the witness' attorney testified that the situation was like "a wink and a nod" because "everybody knows what's going to happen, but there is never an offer conveyed." Id. at 513. Our supreme court held that there was no Brady violation, and it noted that "the fact that [the witness] later pled guilty to a lesser charge of facilitation of the offenses does not establish the existence of a prior agreement." Id. at 514.

In the instant case, the Defendant did not present any evidence that established the existence of an agreement between the State and Mr. Conatser before the Defendant's trial that was designed to procure B.C.'s testimony. The Defendant's trial was held in May 2006, and Mr. Conatser did not plead guilty to one count of statutory rape until March 2007. B.C. testified that no one told her that, if she did not testify, then Mr. Conatser would go to jail. She explained that she cooperated because she did not want her child taken away from her. We note that the jury heard testimony that B.C. was concerned about something happening to her baby. The jury also heard testimony that B.C. was married to Mr. Conatser and that Mr. Conatser had also been charged in connection with the photographs. Thus, because the Defendant did not establish the existence of a prior plea agreement, we conclude that there was no Brady violation. The Defendant is not entitled to relief on this issue.

### III. Sentencing

The Defendant presents the following sentencing issues for review: (a) the trial court erred when it found the Defendant was the leader in the commission of an offense involving two or more criminal actors; (b) the disparity between the Defendant's sentence and Mr. Conatser's sentence violated the Tennessee Criminal Sentencing Reform Act of 1989; and (c) the trial court erred by imposing consecutive sentences.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant

facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

## A. Enhancement Factor

At his sentencing hearing, the Defendant executed a waiver agreeing to be sentenced in accordance with the 2005 amendments to the Sentencing Act, which became effective June 7, 2005. The amended statute no longer imposes a presumptive sentence. Carter, 254 S.W.3d at 343. As further explained by our supreme court in Carter,

> the trial court is free to select any sentence within the applicable range so long as the length of the sentence is "consistent with the purposes and principles of [the Sentencing Act]." [Tenn. Code Ann.] § 40-35-210(d). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," [Tenn. Code Ann.] § 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," [Tenn. Code Ann.] § 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," [Tenn. Code Ann.] § 40-35-103(5).

Id. (footnote omitted).

The 2005 Amendment to the Sentencing Act deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered these factors merely advisory, as opposed to binding, upon the trial court's sentencing decision. Id. Under current sentencing law, the trial court is nonetheless required to "consider" an advisory sentencing guideline that

-12-

is relevant to the sentencing determination, including the application of enhancing and mitigating factors. Id. at 344. The trial court's weighing of various mitigating and enhancing factors is now left to the trial court's sound discretion. Id. Thus, the 2005 revision to Tennessee Code Annotated section 40-35-210 increases the amount of discretion a trial court exercises when imposing a sentencing term. Id. at 344.

To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See id. at 343; State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001). If our review reflects that the trial court applied inappropriate mitigating and/or enhancement factors or otherwise failed to follow the Sentencing Act, the presumption of correctness fails and our review is de novo. Carter, 254 S.W.3d at 345.

As we have noted, each of the Defendant's convictions is a Class C felony. As a Range I, standard offender, the Defendant's sentencing range for each conviction was three to six years. See Tenn. Code Ann. § 40-35-112(a)(3).

The trial court found the following enhancement factors applied to the Defendant: (1) The Defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range[8]; (2) The Defendant was a leader in the commission of an offense involving two or more criminal actors; and (7) The offense involved a victim and was committed to gratify the Defendant's desire for pleasure or excitement. See Tenn. Code Ann. § 40-35-114(1), (2), (7). The trial court also found that one mitigating factor applied: (1) The Defendant's criminal conduct neither caused nor threatened serious bodily injury. See Tenn. Code Ann. § 40-35-113(1). The Defendant received a sentence of five years for each of his ten convictions.

The Defendant only contests the application of the second enhancement factor—that he was a leader in the commission of an offense involving two or more criminal actors. Discussing the application of this factor to the Defendant, the trial court commented, "There is, I think, the potential charge for someone else in this case but by virtue of the [D]efendant's age, the placement and the providing of the—of the equipment necessary to commit this offense, he was, in effect, the leader of this—of this activity." We note that "being a leader in the commission of an offense does not require that the defendant be the

---

[8] The pre-sentence report revealed that, in 1974, the Defendant was sentenced to fifteen years in a Florida prison after he pleaded guilty to manslaughter following the death of a child. In 1988, the Defendant received a sentence of eight years following a conviction for drug trafficking in Mexico.

sole leader but only that he be 'a' leader." State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993); see also State v. Frank E. Huey et al., No. M2000-02793-CCA-R3-CD, 2002 WL 517132, at *9-10 (Tenn. Crim. App., Nashville, Apr. 5 2002) (enhancement factor for being the leader in the commission of the offense affirmed for a defendant who was convicted of facilitation of first degree murder and facilitation of attempted first degree murder); State v. Oneal Sanford, No. E1999-02089-CCA-R3-CD, 2001 WL 681312, at *8 (Tenn. Crim. App., Knoxville, June 18, 2001) (defendant convicted of facilitation of attempted especially aggravated robbery and facilitation of aggravated assault found to be leader in the commission of the offense). The State established that the Defendant took the photographs with his digital camera and that some of the images had been downloaded onto the Defendant's computer. Moreover, B.C.'s testimony at trial revealed that it was the Defendant's idea to take these photos and that she initially did not want him to take them, but obliged when he said that "it would be an experience." We conclude that the trial court did not err when it applied this enhancement factor to the Defendant. This issue is without merit.

**B. Disparity in Sentences**

The Defendant asserts that an unjustified disparity occurred when he was sentenced to five years for each of his ten convictions for facilitation to commit especially aggravated sexual exploitation of a minor and Mr. Conatser was sentenced to two years for one conviction of statutory rape, given that both of their convictions arose from the same events. The Defendant claims that this disparity violates the Tennessee Criminal Sentencing Reform Act of 1989.

One of the purposes of our sentencing statute "is to assure fair and consistent treatment of all defendants by eliminating unjustified disparity in sentencing and providing a fair sense of predictability of the criminal law and its sanctions." Tenn. Code Ann. § 40-35-102(2). When determining a defendant's sentence, trial courts are instructed to consider the following:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for *similar offenses* in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (emphasis added).

As the State correctly points out, nothing in the Sentencing Act allows trial courts to consider the sentence of a defendant convicted of a *different* crime. Here, Mr. Conatser pleaded guilty to one count of statutory rape, a Class E felony. The Range I sentence for a Class E felony is one to two years; Mr. Conatser was sentenced to two years, to be served on probation. The Defendant, on the other hand, was convicted of ten Class C felonies, for which the Range I sentence is three to six years for each count. After finding that three enhancement factors and one mitigating factor applied, the trial court sentenced the Defendant to five years for each conviction. Therefore, we conclude that the disparity between Mr. Conatser's sentence and the Defendant's sentences were justified—because one was convicted of multiple Class C felonies and one was convicted of a single Class E felony. The Defendant is not entitled to relief on this issue.

## C. Consecutive Sentences

Following the Defendant's sentencing hearing, the trial court sentenced the Defendant as a Range I, standard offender to five years for each of his ten convictions. The trial court ordered that he serve five of his sentences consecutively, for a total effective sentence of twenty-five years. The Defendant appeals the imposition of consecutive sentences.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may, in its discretion, order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
(2) The defendant is an offender whose record of criminal activity is extensive;
(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the

-15-

sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

Rule 32(c)(1) of the Tennessee Rules of Criminal Procedure provides that the trial court "shall specify the reasons" for its decision that a defendant's sentences run concurrently or consecutively. However, in this case, the record reflects only that the trial court sentenced the Defendant to five consecutive sentences per section 40-35-115(b)(5) of Tennessee Code Annotated. Indeed, the State concedes that "the trial court failed to specify its reasons for imposing consecutive sentences." Thus, we review the imposition of consecutive sentences de novo.

Even though the conduct of the Defendant was reprehensible, and while not disregarding the seriousness of crimes of this nature, we conclude that the circumstances in this case militate against the application of Tennessee Code Annotated section 40-35-115(b)(5). There was no special relationship between the Defendant and the victim. There is no indication that these photographs represented a significant time span of undetected sexual activity.[9] Given the facts of this case, we cannot conclude that the nature and scope of the sexual acts was aggravated beyond what is inherent in the offenses for which the Defendant was convicted. Finally, as the State also concedes, there was no evidence presented at trial or at the sentencing hearing that B.C. suffered any residual physical or mental damage. Therefore, we conclude that the trial court erred when it ordered that five of the Defendant's convictions be served consecutively. We modify the Defendant's sentences to reflect that they be served concurrently and remand the case to the trial court for entry of judgments consistent with this opinion.

### IV. Newly Discovered Evidence

The Defendant contends that, at his motion for new trial hearing, he presented new evidence sufficient to support a new trial. Specifically, he notes the following exchange between defense counsel and Mr. Conatser during the hearing:

---

[9] B.C. replied in the affirmative when asked whether all of the pictures were taken between the summer of 2003 and when the TBI spoke to her in April 2005; however, with the exception of Exhibits 14, 15, 16, and 17, she was unable to remember when the various photographs were taken. We also note that the State concedes, "[T]he [D]efendant's involvement was brief."

Q: Didn't you, in fact, tell a person that if Mr. Brozik had seen [B.C.] nude, you would kill him?

A: Yes, sir, I said that, but it was just—

Q: You—no. That's all I asked you. You did say that, didn't you?

A: I said that.

Q: That was a friend of yours, wasn't it?

A: Yes, sir.

Q: And you all were riding around together?

A: Yes, sir.

Q: And you said you didn't understand how Mr. Brozik would get convicted of anything, didn't you, because he hadn't done nothing?

A: I don't remember what I said, sir. I just know what you're talking about, yes.

The State argues that the Defendant has waived this issue by failing to raise it in either his Motion for New Trial or Amended Motion for New Trial. We agree with the State that this issue has been waived. See Tenn. R. App. P. 3(e) (stating that any ground upon which a new trial is sought must be stated in a motion for new trial and, if not, "such issues will be treated as waived"). Thus, the Defendant is not entitled to relief on this issue.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the Defendant's convictions, but modify his sentences to reflect that they be served concurrently. We remand to the trial court for entry of judgments consistent with this opinion.

_____
DAVID H. WELLES, JUDGE

-17-